## MARGARET ALSWORTH v. G. D. PACKARD.[1]

July 25, 1930.

No. 27,876.

[1]Reported in 231 N. W. 916.

*Leo J. Seifert* and *S. B. Wilson, Jr.* for appellant.
*E. H. Nicholas* and *Putnam & Carlson,* for respondent.

DIBELL, J.

Action by the plaintiff as administratrix of a deceased copartner, A. D. Packard, against the surviving copartner, G. D. Packard, for an accounting. There were findings and conclusions for the plaintiff directing judgment in her favor for $66,000 with interest at six per cent from February 18, 1922, the date of the death of the decedent—a total of about $95,000 at the date of the findings. The defendant appeals from the order denying his motion for a new trial.

On August 10, 1928, the plaintiff was appointed administratrix of the estate of A. D. Packard, who died intestate on February 18, 1922, at Sherburn, in Martin county. He left surviving him three children, the plaintiff, the defendant, and a daughter Mrs. Lilly Bagley.

The deceased came to Sherburn from Wisconsin about 1887 or 1888 and for a time was in partnership with his brother, long since deceased. In the books of this copartnership, about 1888, there was an entry in the handwriting of A. D. Packard stating that the

defendant, G. D. Packard, "turned over $940.58." About 1890 or 1891 the deceased and the defendant were in partnership. No further mention was made of the specific item of $940.58. It may perhaps be inferred that this was the money of the defendant that first went into the partnership.

The father and son commenced in a small way. The defendant was then only a few years above his majority. Business was done under the name of A. D. Packard & Son until 1920, a period of some 30 years. The name of A. D. Packard was used largely though not exclusively after that. They were engaged in buying and selling hay, and extended their business until they acquired a grain elevator and finally several grain elevators in near-by towns. They also engaged extensively in the farm implement business at Sherburn. They owned a garage and blacksmith shop. Each copartner had a homestead. Lands were bought. Title was taken in the name of the defendant. We recall but two exceptions—that of one farm which was taken in the name of the two in 1914, and the homestead of the father which was taken in his name. The father and his wife quitclaimed the farm mentioned to his son in 1919 or 1920.

The trial court found that there was a partnership between father and son and that it continued until the death of the father on February 18, 1922. This finding is sustained, for a partnership existed in 1920, or thereabouts, and there was no evidence requiring a finding that it was dissolved until the death of the father.

■ The ultimate legal question is a simple one. It is for the son as surviving partner to account to the representative of the estate of his father appointed by the probate court. There is some dispute as to the ownership of the real property. The plaintiff was appointed administratrix six years after his death and then brought this suit. In the meantime the son had carried on the business, had given his attention to the farms, paid debts, made new mortgages, paid taxes, and apparently had conducted the business much as before.

■ The plaintiff before suit contented herself with asking her brother for a settlement. There is evidence that he offered an inadequate one to be made as soon as he was in financial shape. The

plaintiff had no correct notion of an accounting as the law uses the term. There was much evidence, about all of it incompetent, admitted over the objection of the defendant, indicating that the beneficiaries contemplated a settlement in accordance with the plan of their father, or at least that there would be a settlement of some kind; and there is a suggestion in the evidence, falling short of legal proof, that all the parties thought that the defendant would run the business from 1920 on and that all would be content if the girls had a farm, apparently a particularly good one, and the old gentleman, who contemplated going to California, should have $10,000. Much of the testimony had nothing to do with the proof of a partnership but tended to show an unenforceable though friendly understanding as to the disposition of the father's property after his death. It is illustrated by the testimony of the plaintiff now to be quoted:

Q. "And after your father died, did you have a talk with your brother, G. D. Packard, about the settlement?

A. "Yes, sir.

Q. "Of the partnership business?

A. "Yes.

Q. "And did you have a talk with him in the year following the father's death about it?

A. "Yes, sir.

Q. "Tell the court what that talk was. What did you say to him?

A. "I asked him if he was going to give us our property that was left us, and he said as soon as he got business straightened up. That times had been a little hard—as soon as he got it straightened up he was going to do this.

Q. "Well, what was the reason that he could not settle with you then?

A. "Well, he said on account of hard times—the war, and everything. * * *

Q. "And did he ever talk with you or ask you what you wanted in the way of settlement?

A. "Yes, he did ask me once.

Q. "And what did you tell him?

A. "I told him I wanted just what our father left us.

Q. "And what did you tell him about that?

A. "Well, he said that that was the Northway place, and he said he will have $10,000 for his personal use, and the home.   *   *   *.

Q. "And you wanted to settle it, you told him, the way your father wanted it settled before he died?

A. "Yes.

Q. "And the $10,000?   And then the home in Sherburn was to go to whom?

A. "Well, he always wanted me to have that.

Q. "He wanted you to have the home at Sherburn?

A. "Yes.

Q. "You told your brother that, did you?

A. "Yes, sir.

Q. "And would he settle with you on that basis?

A. "No.

Q. "And did you tell him that you were willing to settle for that?

A. "Yes, sir.

Q. "You were to have the Northway place and $10,000?

A. "Yes.

Q. "—and the home in Sherburn?

A. "Yes.

The Court: "You say 'you'.   Does that mean her, individually?

Mr. Nicholas: "No.

Q. "You and the sister?

A. "Yes.

Q. "You and the sister were to have the Northway place, you told him?

A. "We were to have this together.

Q. "Together?

A. "Yes."

On cross-examination Mrs. Alsworth testified:

Q. "Now, yesterday you told us that you told your brother, the defendant, that you wanted your share of the property which your father intended you to have. Is that right?

A. "Yes, sir.

Q. "And you said that your father intended you to have the Northway farm, $10,000 in cash, and that was to be divided between you and your sister, Mrs. Bagley, is that right?

A. "Including the home.

Q. "Well, the home was to go to you personally?

A. "Yes, sir."

A few days before his death the decedent visited Mrs. Wolford, his niece, and according to her testimony this conversation was had:

Q. "And what did he come up there for?

A. "Well, he seemed to be troubled.

Q. "Yes?

A. "He was very much broken up, it seemed.

Q. "Well, what do you draw your conclusions from? How did he act?

A. "Well, he cried. * * *

Q. "And did he talk about what settlement he was trying to make or wanted to make?

A. "Why, he said he wanted this farm for the girls and he wanted $10,000 out of the business for his personal use, and DeAlton might have all the rest of the property."

Mr. Wolford testified about the same transaction:

Q. "And in that talk how did it affect the old gentleman?

A. "It seemed to affect him awfully.

Q. "Did he break down and cry about it?

A. "Yes, he did.

Q. "What else did he say at that time, Mr. Wolford, about this transaction?

A. "Well, when he found it out, he said to DeAlton, 'What did you do that for?' He says, 'You know I wanted that for the girls.'

Q. "Yes?

A. "And he said that DeAlton said that the reason he done it was he could handle it better by having it in his own name.

Q. "Yes. Now, was anything further said about his talk with DeAlton?

A. "Well—

Q. "Wasn't there something about $10,000?

A. "Yes, he said he told DeAlton he wanted him to have most of the property.

Q. "He wanted DeAlton to have most of the property?

A. "He wanted DeAlton to have most of the property. He wanted $10,000 for himself, he said, and he wanted that place for the girls.

Q. "And what about the homestead?

A. "Well, he said the house, he wanted that for Maggie."

This evidence did not tend to prove a partnership, but a partnership is definitely established. It may have tended to show what the parties had in mind as to how the partnership property eventually should be divided; but that is of no consequence here.

■ Among the property which the court found to be copartnership property for which the defendant must account was a quarter section in Martin county known as the Ekstrand farm. The defendant obtained title to a quarter section of land in the state of Washington under the timber and stone act. This was finally traded for the Ekstrand quarter. We are unable to find evidence justifying a finding that this land is partnership property. The inclusion of the Ekstrand property is alone such as to require a new trial and another accounting. There was in addition a so-called Ekstrand 80. This was bought by the defendant and paid for substantially from money which he borrowed and for which he gave a mortgage. The man to whom the defendant mortgaged says that he asked the father whether he had any interest in this land, and he told him that he had not. This 80 was included among the lands

for which the defendant was required to account. A re-examination should be had of the facts concerning this 80. The defendant, so far as we can see from the evidence, cannot be charged with his homestead or with either of the two homesteads which he had owned.

■ The court held that the defendant must account to the administratrix for $66,000, and gave judgment for this amount in the plaintiff's favor. The amount was reached in this way. In applying for a loan in August, 1922, shortly after his father's death, on a quarter section known as the Wiebner farm, the defendant stated that the value of that farm was $27,912; that the value of other land owned by him was $95,525; that other property which he owned was of the value of $47,980, making a total of $171,417; and that his indebtedness was $39,400, leaving a net balance of $132,000. The court held that all of this property was partnership property, and that the defendant should account to the administratrix for one-half or $66,000. Of this he would of course have one-third upon the accounting of the administratrix. The brief of the respondent says that the defendant's statement of the value of his property was under oath. We do not find the portion of the record showing this.

The defendant could not be required to account for his homestead as partnership property. The title to the father's homestead, his wife having predeceased him, would go equally to the three children, the decedent's life estate terminating at his death. It was not partnership property. The defendant should not account for it.

We are of the view that a finding of the value of the property at $132,000, because of the defendant's statement of its value in 1922, or because of that in connection with other evidence, cannot be sustained.

■ We cannot sustain the addition of six per cent per annum on $66,000 from the time of the death of the father to the time of trial as representing the gain or increase or profit for that period for which the defendant should account. If sustained, there was a net profit income, not compounded, of six per cent upon the total

of the value of the lands and other property without allowance for accruing taxes or costs of operation or for compensation or super-intendence of administration, a total of about $29,000. A net profit of six per cent per annum, no taxes, no ditch assessments, no expenditures paid in keeping up the property, upon a valuation which was large and uncertain, was quite beyond facts which we can see.

The defendant was conducting a very considerable implement machinery business and may have had profits. If so, they were the result of considerable individual effort, and in considering an accounting many other elements might be important. Neither the plaintiff nor the defendant gave particular attention to them. If the closing of the estate and the depression in farm lands from 1922 on brought loss in profits or values it was loss in which the three beneficiaries must participate. The defendant had done nothing which required that he assume it all.

There must be a new trial. We might say so and stop. We are tempted to go a bit further. A history of the affairs involved, extending over a period of 40 years, is possible. The law has the machinery, and there is enough time to hunt up early transactions and investigate facts and come to as correct a conclusion as human means can reach on disputed testimony after so long a time. The effort used and the time consumed largely will be wasted effort and time. It is not the fault of the law. It comes because of the short-comings and delays and faults of the people concerned. The necessary money doubtless can be found to carry on the quarrel. The beneficiaries are well along in years. If the money and property could be had now they would have some enjoyment of it for quite a while. If active in litigation they will probably be able to get their controversy at an end so that one has all, or each a part, or none of them anything at all, before the end comes. It is clear that two or three men, counsel on both sides, for instance, or court and counsel could shortly divide the property on a basis which would be fair to all. Our suggestion may be as worthless as it is cheap; and if so, there remains to the parties under our system of law, with which under no circumstances do we quarrel, the right

to continue the fight to the end under the untoward circumstances presented.

If there is a new trial, the plaintiff may care to re-examine some of the rules of law relative to declarations of the father as to matters affecting himself and his son, and not the partnership and others, and the father's declarations to others as to what the son had done in conducting the partnership.

There is a claim that the defendant destroyed his books so that the condition of the partnership could not be determined. There may or may not be something in this. Counsel for the defendant in their brief say that they gave counsel for the plaintiff the books, so far as they were worth while, and that they were accessible at the trial. This is a matter which may be considered on another trial. It may or may not be serious. It has not impressed us as being of great importance.

Order reversed.

WILSON, C. J. took no part.

